OPINION OF THE COURT
Wallace R Cotton, J.
The owners of Damage Parcel Nos. 66, 69, 70 and 72 challenge the constitutionality of subdivision 2 of section 3-a of the General Municipal Law which limits prejudgment interest arising out of a condemnation award to 6%, contending that compensation computed at the rate provided by statute results in constitutionally unjust payment.
If payment for the public taking of private property is not made at time of vesting title in condemnor, damage interest computed from date of taking to time of payment must be added to the amount of payment in order that compensation may be just. (Jacobs v United States, 290 US 13; City of Buffalo v Clement Co., 28 NY2d 241.)
Since the rate at which damage interest is paid is a necessary element of just compensation, the determination of its fairness is a judicial function. (City of Buffalo v Clement Co., supra.)
During the 1970’s changing economic circumstances gave rise to the question of the constitutional fairness of the 6% rate which the Legislature had raised from 4% in August, 1966 (State Finance Law, § 16). As late as June, *572 1977 the 6% rate was found to be judicially adequate (Matter of City of New York [Washington Hgts.-Highbridge Park Community Dev. Area] 82 Misc 2d 557, affd 56 AD2d 513, mot for lv to app den 41 NY2d 806; Matter of County of Nassau [Eveandra Enterprises], 51 AD2d 722, affd 42 NY2d 849, app dsmd 434 US 804; Troy Urban Renewal Agency v Union Nat. Bank of Troy, 90 Misc 2d 240).
Considering the changing economic conditions, clearly what was determined to be judicially adequate in 1977 need not necessarily presently be termed fair or judicially adequate within the meaning of just compensation as mandated by our Constitution. Certainly not when the rate of inflation in the 1960’s ranged from a mere 3% to 6% per annum, a figure far below the demonstrated rate of our present day inflation.
From our experience of the past decade we have learned that when inflation surged interest rates ran alongside. When inflation fell interest rates tumbled. As recently as 1976 with inflation about 5%, the Treasury paid 5% or less on its short-term borrowing. Notwithstanding something less than heroic effort to “whip inflation now”, the increased cost of imported energy has created a historic permanent shift in our international balance of payments marked by an increase in the price of gold and decline in the value of the dollar. No one has escaped the inflationary impact of these events. Like Alice in Wonderland everyone has found it necessary to run faster every year to stay where we are.
In 1978 and 1979 the Legislature in recognition of the business communities’ inability to obtain mortgage financing because lending institutions would not loan money at the then low prevailing statutory fixed rates while forced to pay a higher dividend rate to their depositors, extended the power of the banking board to increase rates of interest. (L 1978, ch 788, § 2, as amd by L1979, ch 6, §§ 1, 4, and L 1979, ch 7, §§ 1, 2.) And, as this decision is written the Governor has recently signed into law a bill increasing postjudgment interest rates from 6% to 9%.
In 1977 short-term interest rates returned average annual yields of about 5x/2% to 5%%, but since 1978 money markets have been characterized by interest rates consis *573 tently and substantially greater than 6%. During 1978, three-month treasury bills yielded an average annual rate of 7%%. This compares with figures ranging between 8% and 8V2% for short-term investments such as three-month certificates of deposit, three-month banker’s acceptances, six-month treasury bills and four- to six-month commercial paper. Also in 1978, three- to five-year treasury bonds were averaging 8.3% and 10-year treasury bills yielded 8.4%. Moody’s registered an average return of 8%% on AAA corporate bonds and an average return of. about 9% on corporate bonds.
Since 1978, all interest rates submitted to the court have risen beyond the already high 1978 levels. In 1979, short-term rates ranged between 10%% and 11%%. Short-term investments ranged between 12y3% and 13y2% in 1980 and have now reached peaks of 18%, medium and long-term treasury bonds were near liy2% in 1980 and have been climbing in the first half of 1981. As recently as August 5, 1981, 10-year treasury notes set a record high of 14.98%. AAA corporate bonds yielded an average of 9.6% in 1979, 11.9% in 1980 and 13% in 1981 as compared with an average of 10.1% in 1979, 12 %% in 1980 and 14% in the first half of 1981 for all corporate bonds.
While interest rates fluctuated around 6% during 1972-1977 period, clearly in light of the evidence before this court, no such finding can now be made. It is of course impossible to foretell when if ever rates might descend to more traditional levels. What is clear, however, is that very high interest rates have been the hallmark of money markets during the last four years. Interest rates consistently have been too far above 6% to find that statutory rate judicially adequate. Accordingly, the court finds 6% to be an unfair and unconstitutional rate for the 1978-1981 period.
On the facts in this case, medium-term public securities provide the basis for calculating the proper interest rate. Medium-term rates reflect market fluctuations to a lesser degree than do short-term rates and more accurately reflect market trends than do long-term interest rates. The broad spectrum of interest rates must and have been *574 considered by this court but medium-term rates have been assigned greater weight.
Medium-term treasury bonds have averaged 8.3% in 1978, 9.6% in 1979, 11.5% in 1980 and have been above 12.5% in the early part of 1981. On these facts, this court finds a 9% rate is “fair” and under the circumstances must be utilized for the 1978-1981 period in order to satisfy the constitutional requirement of just compensation.